**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DWAYNE WALKER, | ) | CASE NO. 1:14-CV-363 |
| | ) | |
| Petitioner, | ) | JUDGE GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| JASON BUNTING, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |

This matter is before the magistrate judge pursuant to Local Rule 72.2(b)(2).

Before the court is the petition of Dwayne Walker ("Walker" or "Petitioner") for a writ of

habeas corpus filed pursuant to 28 U.S.C. § 2254.  Walker is in the custody of the Ohio

Department of Rehabilitation and Correction pursuant to journal entry of sentence in the

case of *State of Ohio vs. Walker*, Case No. CR-11-549326-B (Cuyahoga County Apr. 9,

2013).  (Doc. No. 6-24.)  For the reasons set forth below, it is recommended that

Walker's petition be DISMISSED with prejudice.

**I. Factual Background**

The state appellate court reviewing Petitioner's direct appeal noted the following

relevant facts:

> Darquez Walker [who is not related to Petitioner] was fatally
> shot at the home of Maurice Thornton around 1:00 a.m. on
> Sunday, April 10, 2011. Darquez had been at Thornton's
> home "shooting dice" in the basement all evening. Several of
> Thornton's and Darquez's friends were also "shooting dice"
> with them, including Ricky Jackson, John Butler, Jamal
> Wilson, and Aaron Crosby.

Thornton's cousin, Erica Freeman, and [Petitioner's co-defendant, Ivan] Maddox arrived at Thornton's house that night around the same time; according to Freeman, it was around midnight. Freeman testified that she stopped at Thornton's house after she left a bar near Thornton's house. She and a friend parked at Thornton's neighbor's house. When they pulled up, she saw Maddox standing in Thornton's driveway. Maddox followed her into Thornton's house.

Thornton and Freeman said that Maddox was intoxicated. Although Thornton and Maddox were friends, Thornton became angry with Maddox for "touching" Freeman. Freeman left after Maddox "grabbed" her. When Freeman and her friend pulled out of the neighbor's driveway, Freeman saw Maddox and another person standing in Thornton's driveway.

Thornton testified that after Freeman left, Maddox said, "I got five niggers that's about to rob next door." Maddox left soon after that. Thornton told Jackson to lock the door behind Maddox, so Jackson went upstairs to do so. Thornton heard Jackson say, "Man, I ain't got nothing." Thornton heard someone fall to the ground, and then Jackson fell down the stairs. A man came down the steps after Jackson; the man was wearing black pants, a white shirt, and a blue bandana around his mouth. Thornton recognized the man as [Petitioner], whom he had first met a few days earlier when Maddox brought [Petitioner] to Thornton's house.

Thornton said that he, Crosby, Butler, and Wilson ran to the laundry room, where it was dark. Thornton testified that [Petitioner] said, "you all ni***ers come the f*** out." Then [Petitioner] said, "you all think I'm playing," and cocked his gun. According to Thornton, [Petitioner] came into the laundry room and started shooting. Darquez ran out of the laundry room and up the stairs; Jackson followed him. After that, [Petitioner] left too. They turned on the lights and saw blood. Crosby called 911.

Crosby, Wilson, Butler, and Jackson all testified. They told the same basic story as Thornton with minor variations, except that none of them could identify [Petitioner]. Jackson explained that when he went upstairs to make sure the door

2

was locked, a man put a gun to his head and said, "lay it down." The man "shoved" Jackson down the stairs, and walked past Jackson toward the laundry room. Jackson heard the man say, "if you don't all come out here, I'm going to start shooting." Jackson said the man just started shooting at that point. Jackson ran out of the house with Darquez following him. Darquez ran with Jackson until he collapsed.

Crosby testified that when they heard Jackson screaming upstairs that he "ain't got nothing," they all knew immediately that they were being robbed. Crosby said that he ran into the laundry room with the others and grabbed his gun, a "380" that he had hidden in the ceiling of Thornton's basement. Crosby hid beside a table in the laundry room; he was lying on the ground, but half sitting up. When the robber came into the laundry room, Crosby testified that he began to feel Crosby's pockets and put his gun to Crosby's head. Crosby waved the robber's gun away and fired back from his position on the ground. Crosby fired five shots. Crosby said the robber fired first. Crosby did not know if he hit the robber, but thought that he might have due to his close proximity.

Crosby testified that after the robber left, he picked up all of the spent bullets and put them in a plastic bag along with his gun and threw them out Thornton's back door. Crosby had a pending charge against him for hiding evidence.

Wilson testified that after they all ran into the laundry room, he heard the robber say, "I ain't playing," and then heard the robber fire two shots.

William Flood testified that he picked up [Petitioner] earlier that evening. They had planned to go to a bar, Bootleggers, on Euclid Avenue. They went to Maddox's house to pick him up too. Maddox and his brother were drinking and "shooting dice" when they arrived. Flood said that [Petitioner] "joined in" and started winning their money. Flood said that Maddox wanted to find another dice game.

Flood testified that he drove to Bootleggers and parked in the parking lot. When they got there, Maddox and [Petitioner] disappeared. Flood denied that he knew anything about the robbery. Flood further denied that he

3

knew where Maddox and [Petitioner] were going, but he "assumed" that they were going to Thornton's house. Flood had "played dice" before at Thornton's.

Flood waited for Maddox and [Petitioner] for a short time, but then decided to call other friends to meet him at the bar. As he did, Maddox came running back to the car, got in, and told Flood to leave. Flood refused. Flood testified that Maddox kept saying, "I shouldn't have done it." Flood further testified that Maddox was not wearing a shirt when he came back to the car. Soon after Maddox returned, [Petitioner] appeared, wearing a white shirt covered with blood. They drove [Petitioner] to the hospital.

Maddox pleaded guilty to robbery and testified against [Petitioner] in exchange for receiving an expected prison term of three to four years. Maddox testified that on the evening of April 9, 2011, Flood and [Petitioner] came to his house. Maddox said that he and [Petitioner] started talking about "robbing a dice game." The plan was that Maddox would "go down or whatever, like [he] was shooting dice down there, just chilling, and [Petitioner] would be waiting outside to walk [him] back in as if [he] was getting robbed." According to Maddox, Flood was aware of what they were doing, but did not have anything to do with it.

Maddox said that after they parked at Bootleggers, he and [Petitioner] walked to Thornton's house. Maddox went into the house with Freeman, while [Petitioner] "walked off." Maddox went downstairs, and hung out with everyone in the basement. Maddox began to feel bad about intending to rob his friends. He stayed about ten minutes, just watching their dice game. Maddox decided not to rob his friends, so he left. He walked out the back door. [Petitioner] was sitting on the back porch waiting for him to come out. Maddox said that he told [Petitioner] "there ain't no money" downstairs, "it's dead." [Petitioner] got upset and told Maddox, "I knew you were going to chicken out. We done. Came here for nothing." Maddox said that as he began to leave, [Petitioner] started looking in the basement windows. [Petitioner] could see that "there was money down there and gambling or whatever." Maddox testified that he did not talk to [Petitioner] after that. Maddox walked back to Flood's car. Maddox did not see what [Petitioner] did after he left.

4

Maddox testified that when he got back to Flood's car, Flood asked him where [Petitioner] was. Maddox said that after a couple of minutes, they saw [Petitioner] "coming up the street [with] bullets in his chest."

A paramedic at Richmond Heights Medical Center testified that he was working when [Petitioner] came to the hospital. The paramedic gave [Petitioner]'s possessions to police: clothes, a loaded gun magazine, a baggy with nine smaller bags of marijuana in it, and a spent bullet fragment from [Petitioner]'s shoes.

When police arrived at the scene, they secured the home and began interviewing witnesses. The police learned that a victim of a gunshot wound was at Richmond Heights Medical Center; the victim was [Petitioner]. They believed the victim might have something to do with the shooting. Soon after arriving on the scene, they also discovered Darquez's body lying on the ground in a nearby driveway. Police called the paramedics, who took Darquez to the hospital.

While they were interviewing witnesses, a neighbor, Marvin Martin, approached police. Martin testified that it was approximately 4:00 a.m. when he talked to the police. Martin told the police that he had seen two men run separately from Thornton's home. Martin said that the second man ran across his yard, holding his chest, and dropped something on the tree lawn near his home. Martin assumed it was a gun. Martin testified that the second man was wearing a white T-shirt and a mask. Martin did not tell police initially because he did not want to get involved.

Martin testified that he had been at Thornton's house all day watching television. He said that he left Thornton's around midnight. When he went back outside, he saw the men running.

After Martin pointed to the "nearby" tree lawn, where he saw the man drop something, officers found a Glock model 23, 40-caliber semiautomatic handgun ("Glock pistol"); the gun was covered in blood. A supervisor of the trace evidence department for the Cuyahoga County Medical Examiner's Office testified that several swabs of blood were taken from the Glock pistol and submitted for DNA testing, two from the gun slide and frame, one from inside the gun barrel, two

from the gun grip, and two from the magazine. A forensic scientist in the DNA department of the Cuyahoga County Regional Forensic Science Laboratory testified that only one representative blood sample from the Glock pistol was tested, from the gun slide, and it matched [Petitioner]'s DNA.

After talking to the witnesses, police officers obtained a search warrant. They found the gun, spent bullets, and cartridges that Crosby had thrown in the backyard; Crosby's gun was a Hi-Point 380-caliber semiautomatic handgun ("Hi-Point pistol"). They found a bullet fragment on the floor of the laundry room, several bullet holes in the laundry room, a brass shell casing located on a folding table inside Thornton's home, and a "projectile" found underneath the basement steps. They also obtained blood samples from all over the house, including one from the front door of Thornton's home, one from the kitchen floor, one from the wall on the basement stairs, and one from the laundry room – all of the samples matched [Petitioner]'s DNA. They found approximately $360 hidden in a shoe in the laundry room. They also found drugs and paraphernalia hidden throughout the house.

A forensic scientist at the Bureau of Criminal Identification and Investigation ("BCI") testified that police submitted two firearms for testing. The first was the Glock pistol with six cartridges, or unfired bullets, that were submitted with the gun. There was one cartridge in the Glock pistol and the other five were in an envelope. Police also submitted the Hi-Point pistol, fired bullets, and fired cartridge cases.

After comparing the fired cartridge cases, the BCI scientist determined that two of the fired cartridge cases that were found at the scene came from the Glock pistol. He was also able to determine that three of the fired 380-caliber cases came from the Hi-Point pistol.

*State v. Walker*, No. 97648, 2012 WL 4243709, **1-5 (Ohio App. Ct. Sept. 20, 2012).

## II. State Procedural History

### A.    State Trial Court Proceedings

In April 2011, the State filed an indictment charging Petitioner and Maddox with:

(1) aggravated murder - prior calculation and design; (2) aggravated murder - causing death during an aggravated robbery; (3) aggravated burglary; (4) aggravated robbery; (5) felonious assault - causing serious physical harm; and (6) felonious assault - causing physical harm using a deadly weapon.  (Doc. No. 6-1).

During Petitioner's October 2011 trial, Detective Daniel Novitski testified that, after Petitioner was released from the hospital, he interviewed him via video recording. (Trial Transcript ("Tr.") at 616.)  The video interview was played for the jury.  (*Id*. at 646.) During the interview, Petitioner told Detective Novitski that he entered Thornton's house intending to play dice.  (Doc. No. 10.)[1]  Petitioner repeatedly denied having a gun on him, and told Detective Novitski that he believed that Maddox had planted the Glock magazine in Petitioner's clothing because Maddox thought that Petitioner was going to die from his gunshot wounds and, thus, could bear the blame for the robbery.  (*Id*.) Petitioner repeatedly denied that he intended to rob anyone.  (*Id*.)  Even in response to the suggestion that Petitioner may have been justified in firing a weapon, Petitioner insisted that he had not fired a weapon in the basement of the home.  (*Id*.)  Petitioner could not explain how his blood got on the gun or why he continued to walk all the way to the laundry room after someone turned off the basement lights.  (*Id*.)

At the close of its evidence, the State moved to dismiss count one of the indictment (aggravated murder with prior calculation and design).  (Doc. No. 6-9.)  The State also moved the trial court to include a jury instruction on Ohio's Castle Doctrine, despite the fact that Petitioner had not asserted the affirmative defense of self-defense.

---

[1] In response to this Court's order, the State filed a DVD of Petitioner's interview with Detective Novitski.

(Doc. No. 6-5.)  Petitioner's counsel did not file any opposition to the motion, which the

trial court granted.  (Doc. No. 6-7.)  During the trial court's jury instructions, it advised

the jury as follows:

> The court further instructs you as follows with respect to the
> rights of the occupants . . .  Maurice Thornton, Jamal
> Wilson, Aaron Crosby, Ricky Jackson, Darquez Walker and
> John Butler, of the residence, dwelling in which this event
> occurred.
>
> A person, Aaron Crosby, is presumed to have acted in self-
> defense and/or defense of another when using defensive
> force that was intended or likely to cause death or great
> bodily harm to another, defendant Dwayne Walker, if that
> person, defendant Dwayne Walker, was in the process of
> entering or had entered unlawful [*sic*] and without privilege to
> do so, the residence or dwelling occupied by Maurice
> Thornton, Jamal Wilson, Aaron Crosby, Ricky Jackson,
> Darquez Walker and John Butler.
>
> The presumption of both self-defense and defense of others
> using defensive force is a rebuttal [*sic*] presumption.  This
> presumption does not apply if defendant Dwayne Walker
> proves by the greater weight of the evidence that he had a
> right to be in the residence or dwelling or he was a lawful
> resident of the residence or dwelling in which the event
> occurred.

(Trial Transcript ("Tr.") at 739-40.)

The jury acquitted Petitioner of counts two (aggravated murder - causing death

during an aggravated robbery) and five (felonious assault - causing serious physical

harm) of the indictment, but convicted him of the lesser included offense of murder in

count two, as well as counts three (aggravated burglary), four (aggravated robbery),

and six (felonious assault - causing physical harm with a deadly weapon).  (Doc. No. 6-

11.)  In November 2011, the trial court sentenced Petitioner to consecutive terms of

imprisonment totaling 28 years to life.  (Doc. No. 6-13.)

8

## B.    Direct Appeal

Petitioner, through different counsel, filed a timely notice of appeal to the state appellate court.  (Doc. No. 6-14.)  In his appellate brief, he raised the following relevant assignments of error:

> III.    The trial court erred by issuing jury instructions that extended the Castle Doctrine to a guest in the home of another.
>
> IV.    Defense counsel was ineffective by cumulative error: failure to offer the proper jury instruction on self defense; failure to object to playing Defendant's interview.[2]

(Doc. No. 6-15.)

In September 2012, the state appellate court affirmed Petitioner's conviction. With respect to Petitioner's argument regarding the Castle Doctrine jury instruction, the state appellate court noted that Petitioner's trial counsel had failed to object to the instruction and, thus, the court applied the harmless error doctrine:

> [Petitioner] concedes that because his trial counsel did not object to the jury instruction provided by the court, we review this issue under the plain error standard. *State v. Barnes,* 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).
>
> Under [Ohio] Crim. R. 52(B), plain errors affecting substantial rights may be noticed by an appellate court even though they were not brought to the attention of the trial court. To constitute plain error, there must be: (1) an error, *i.e.*, a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, *i.e.*, affected the outcome of the trial. *Barnes* at 27, 759 N.E.2d 1240. Courts

---

[2] Although the issue was not mentioned in the heading for section of his appellate brief in which Petitioner discussed ineffective assistance of trial counsel, Petitioner also asserted that his trial counsel was ineffective in failing to object to leading questions.  (Doc. No. 6-15 at 41-42.)

9

are to notice plain error under [Ohio] Crim. R. 52(B), " 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " (Citation omitted.) *Id*.

\* \* \*

We disagree with [Petitioner] that the Castle Doctrine does not extend to invited guests in another's home. Under [Ohio Rev. Code] 2901.05(B)(1), the person using defensive force must "occupy" (not own) the residence or vehicle that the intruder enters. Further, [Ohio Rev. Code] 2901.05(D)(3) explicitly defines "residence" as "a dwelling in which a person resides either temporarily or permanently or is visiting as a guest."

We do find it troubling, however, that the trial court instructed the jury on the Castle Doctrine at all. Here, Aaron Crosby – the invited guest – was not on trial. Had Aaron Crosby been charged with Darquez's death or shooting [Petitioner], then Aaron Crosby would have been entitled to a jury instruction on the rebuttable presumption that he acted in self-defense when he shot his Hi-Point firearm. But because Crosby was not on trial, the Castle Doctrine was wholly inapplicable to the facts of this case.

Even more troubling, the trial court misstated the law on the Castle Doctrine in charging the second part of the instruction – where it instructed the jury that the presumption in Aaron Crosby's favor "does not apply if defendant [Petitioner] proves by the greater weight of the evidence that he had a right to be in the residence or dwelling or he was a lawful resident of the residence or dwelling in which the event occurred." The trial court improperly informed the jury that the presumption shifted the burden to [Petitioner] – the defendant – to prove that he was lawfully in Thornton's home. The Castle Doctrine, as set forth in [Ohio Rev. Code] 2901.05(B)(1), gives a defendant the presumption of self-defense – that the state must then rebut by a preponderance of the evidence. [Petitioner] did not have to prove anything in this case.

Thus, the trial court erred in instructing the jury that Aaron Crosby was entitled to the presumption that he acted in self-defense and in charging the jury that [Petitioner] had to

10

> prove that he was lawfully in Thornton's residence. This court, however, must still determine if the trial court's error rose to the level of prejudicial error, *i.e.*, but for the trial court giving the erroneous instruction to the jury, the outcome of the trial clearly [would] have been different.
>
> We conclude that [Petitioner] would have been convicted without the erroneous instruction. As we summarized previously, police found a loaded 40-caliber gun magazine in [Petitioner's] pocket at the hospital, matching a 40-caliber Glock pistol that was found at the scene – with [Petitioner's] blood all over it. Police also matched fired cartridges found at the scene to the Glock pistol. And [Petitioner's] blood was found in the laundry room, where all the shots were fired.

*Walker*, 2012 WL 4243709 at * 9-10.  The court remanded the case to the trial court to consider whether consecutive sentences were appropriate, and to make the findings regarding that issue that are required by Ohio law.  *Id.* at *17.

Petitioner, through counsel, filed a timely notice of appeal and memorandum in support of jurisdiction in the Ohio Supreme Court.  (Doc. Nos.6-18, 6-19.)  In his memorandum in support of jurisdiction, he asserted the following propositions of law:

> I.    It is a violation of due process for a trial court to afford a non-defendant the presumption of self -defense against the defendant.

(Doc. No. 6-19.)  On February 20, 2013, the Ohio Supreme Court declined jurisdiction and dismissed Petitioner's appeal.  *State v. Walker*, 983 N.E.2d 368 (Table), 2013 WL 628630 (Ohio 2013).

In April 2013, the state trial court, on remand from the state appellate court, conducted a re-sentencing hearing.  (Doc. No. 6-24.)  After making the findings required by Ohio law, the state trial court again imposed consecutive terms of imprisonment totaling 28 years to life.  (*Id*.)

11

### III. Proceedings in This Court

On February 19, 2014, Petitioner, through counsel, filed his § 2254 petition in

this Court.  (Doc. No. 1.)  He raises a single ground for relief:

> The trial court violated Appellant's right to due process under
> the United States Constitution when it shifted the burden of
> proof to Walker by instructing the jury to give his accuser the
> presumption of self defense.

> Supporting Facts: Dwayne Walker was shot five times by
> Aaron Crosby, in a basement where Aaron Crosby and five
> of his friends had been smoking marijuana and gambling all
> day.  Crosby, while shooting Dwayne, also shot one of his
> own friends, who later died.  Dwayne Walker escaped the
> scene and made it to the hospital.  Crosby did not call the
> police, hid evidence of the shooting, then eventually blamed
> Walker for attempting to rob him and his friends.  The trial
> court instructed the jury that Crosby, who admittedly shot
> Dwayne Walker, had the presumption of self-defense
> against Walker.  The Eighth District Court of Appeals found
> this instruction to have been error by shifting the burden of
> proof to Walker.  The court incorrectly refused to grant a
> new trial, citing harmless error.

(*Id*. at 5.)

### IV. Procedural Issues

**A.**     **Jurisdiction**

A state prisoner may file a § 2254 petition in "the district court for the district

wherein such person is in custody or in the district court for the district within which the

State court was held which convicted and sentenced him."  28 U.S.C. § 2241(d).  The

Court of Common Pleas of Cuyahoga County, Ohio sentenced Petitioner.  (Doc. No. 6-

24.)  Cuyahoga County is within this Court's geographic jurisdiction.  *See* 28 U.S.C.

§ 115(a). Accordingly, this Court has jurisdiction over the petition.

12

### B.     Exhaustion and Procedural Default

A state prisoner must exhaust all available state remedies or have no remaining state remedies available prior to seeking review of a conviction via federal habeas corpus.  *See* 28 U.S.C. § 2254(b) and (c); *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Riggins v. McMackin*, 935 F.2d 790, 793 (6th Cir. 1991).  If any state procedures for relief remain available, the petitioner has not exhausted his state remedies, and a federal court must dismiss his petition.  *See Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  The exhaustion requirement is properly satisfied when the highest court in the state in which petitioner was convicted has been given a full and fair opportunity to rule on all the petitioner's claims.  *See Manning v. Alexander*, 912 F.2d 878, 881-83 (6th Cir. 1990).

Similarly, a federal court may not review  "contentions of federal law . . .  not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure."  *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  When a petitioner "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

If the State argues that a petitioner has procedurally defaulted, the Court must conduct a four-step analysis to determine whether the petitioner has indeed defaulted

13

and, if so, whether the procedural default may be excused:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . . Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. . . . This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims. . . . [Fourth, if] the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate . . . that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  A petitioner may also overcome procedural default by demonstrating that failure to consider the defaulted claim will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.

### 1.    Procedural Default: Contemporaneous Objection Rule and Plain Error Review

Here, the State argues that Petitioner's single ground for relief is procedurally defaulted because his attorney failed to object to the Castle Doctrine jury instruction and, thus, did not preserve it for review.[3]  It is well settled in Ohio law that," where a

---

[3]  The State offers the alternative argument that Petitioner's ground for relief is not cognizable on habeas.  This argument has merit.  In a federal habeas action, errors in jury instructions are generally not cognizable unless they deprive a defendant of a fundamentally fair trial.  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Wood v. Marshall*, 790 F.2d 548, 551-52 (6th Cir. 1986) ("In a habeas proceeding, allegedly improper jury instructions must be shown to have infected the accused's trial to such a degree to constitute a clear violation of due process.  The petitioner must show more than that the instructions are undesirable, erroneous or universally condemned.") As discussed below, *infra*, the jury instruction at issue did not implicate the jury's consideration of the elements

party fails to make a "contemporaneous objection" to an alleged error at trial, that error is not preserved for appellate review. *State v. Murphy*, 747 N.E.2d 765, 788, 91 Ohio St.3d 516, 532 (Ohio 2001) ("The [contemporaneous objection] rule is of long standing, and it goes to the heart of an adversary system of justice."). The state appellate court applied the rule in this case. *Walker*, 2012 WL 4243709 at * 9 ("[Petitioner] concedes that because his trial counsel did not object to the jury instruction provided by the court, we review the issue under the plain error standard.") The Sixth Circuit has recognized that Ohio's contemporaneous objection rule is an independent and adequate state ground. *Scott v. Mitchell*, 209 F.3d 854, 866 (6th Cir. 2000).

Petitioner argues that, despite the state appellate court's reliance on the contemporaneous objection rule, his jury instruction claim is not procedurally defaulted. According to Petitioner, the state appellate court necessarily reviewed the merits of the claim – and decided that the trial court had erred in giving the Castle Doctrine instruction – because the court reviewed the issue for plain error. This argument lacks merit. Ohio's Rules of Criminal Procedure contain a single exception to the contemporaneous objection rule: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Ohio R. Crim. P. 52(B). Under Ohio law, in order to constitute "plain error," there must be: (1) a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, *i.e.*, affected the outcome of the trial. *State v. Barnes*, 759 N.E.2d 1240, 1247,

---

of the offenses for which Petitioner was convicted.  Accordingly, the Castle Doctrine instruction did not deprive Petitioner of a fundamentally fair trial.  The non-cognizability of Petitioner's ground for relief is an alternative basis upon which the Court could dismiss his habeas petition.

94 Ohio St.3d 21, 27 (Ohio 2002). Here, after determining that Petitioner had failed to preserve the alleged jury instruction error for appellate review, the state appellate court applied Criminal Rule 52(B) and reviewed Petitioner's argument regarding the jury instruction for plain error. *Walker*, 2012 WL 4243709 at *10. The appellate court concluded that the trial court erred in giving the instruction. *Id*. The appellate court, however, did not excuse Petitioner's failure to preserve the issue because Petitioner "would have been convicted without the erroneous instruction." *Id*. It is well established in the Sixth Circuit that a state appellate court's "plain error review does not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). Accordingly, Petitioner's ground for relief is procedurally defaulted.[4]

### 2.    Cause and Prejudice

Petitioner argues that his trial counsel's ineffective assistance in failing to object to the jury instruction at issue constitutes sufficient cause to excuse the procedural default of his single ground for relief. It is well established that "the exhaustion doctrine

---

[4] In support of his argument that the state appellate court's plain error review was sufficient to constitute review on the merits despite his procedural error, Petitioner relies on case law from the Eighth Circuit, *Lannert v. Jones*, 321 F.3d 747 (8th Cir. 2003); *Sweet v. Delo*, 125 F.3d 1144 (8th Cir. 1997); and *Hadley v. Caspari*, 36 F.3d 51 (8th Cir. 1994), in which that court determined that, despite the state trial court's acknowledgment of a procedural error by the defendant, the trial court's "cursory review" was sufficient to preclude procedural default of the relevant claims. These cases are not binding on this Court, particularly as the Sixth Circuit has expressly determined that a state trial court's plain error review does not preclude a finding of procedural default. Further, the Eighth Circuit has not settled the issue of whether a state trial court's plain error review is sufficient to avoid procedural default. *See Shelton v. Purkett*, 563 F.3d 404, 408 (8th Cir. 2009) ("Unfortunately, there exists an oft-noted, yet surprisingly persistent, split of authority in our circuit about whether plain error review 'cures' the procedural default."). Accordingly, these cases do not require the conclusion that the state appellate court reviewed Petitioner's claim on its merits for the purposes of avoiding procedural default.

. . . generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Murray v. Carrier*, 477 U.S. at 488-89.  Here, the state court records reflect that, although he raised an ineffective assistance claim based on other alleged errors by his trial counsel, Petitioner did not assert an ineffective assistance of trial counsel claim based on the specific argument that his trial counsel failed to object to the Castle Doctrine jury instruction.  Rather, on direct appeal, Petitioner argued that his trial counsel was ineffective in failing to request a correct instruction on self-defense. In its opinion affirming his conviction, the state appellate court construed the argument as contending that Petitioner's trial counsel was ineffective in failing to object to the Castle Doctrine instruction, and reviewed it accordingly.  *See Walker*, 2012 WL 4243709 at *12.  In his memorandum in support of jurisdiction, however, Walker did not assert any claim of ineffective assistance of trial counsel to the Ohio Supreme Court. Accordingly, he has not exhausted any claim of ineffective assistance based on his trial counsel's failure to object to the Castle Doctrine instruction, and, thus, his trial counsel's alleged ineffective assistance in failing to raise such an objection likely cannot constitute cause for the procedural default of Petitioner's ground for relief.  Regardless, even if Petitioner had properly exhausted a claim of ineffective assistance based on this issue, that ineffective assistance would only satisfy the "cause" element of the test for excusing procedural default.  In order to avoid his procedural default, Petitioner is still required to demonstrate prejudice resulting from the trial court's Castle Doctrine instruction.  For the reasons discussed in Section IV(B)(3)(a), *infra*, Petitioner cannot demonstrate that he was prejudiced by the instruction and, thus, he cannot demonstrate

17

that his procedural default should be excused in this case.

### 3.     Fundamental Miscarriage of Justice

#### a.     Structural Error

Petitioner also argues that this Court's failure to review his ground for relief will result in a fundamental miscarriage of justice.  According to Petitioner, the Castle Doctrine instruction improperly shifted the burden of proof at trial to Petitioner, and required him to prove that he was lawfully in the home where the shooting occurred, which constitutes structural error and excuses his procedural default.  He does not, however, cite to any "clearly established Federal law" holding that this type of erroneous jury instruction is a structural error, particularly given the facts of this case.  28 U.S.C. § 2254(d); *see Woods v. Donald*, ___ S. Ct. ___, ___ U.S. ___, 2015 WL 1400852, *3 (March 30, 2015) ("We have explained that 'clearly establish Federal law' for the purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions.") (internal quotation marks omitted).   The State responds that, to the extent that the state trial court erred in giving the Castle Doctrine instruction, any such error is subject to harmless error review, which requires Petitioner to demonstrate that he was prejudiced by the trial court's jury instruction before it can excuse his procedural default of this claim.

Given current case law in the context of procedural default, the distinction argued by the parties is not relevant.  This is because, under Sixth Circuit law, even if the trial court's error in giving the Castle Doctrine instruction did constitute structural error, Petitioner is still required to demonstrate that the error actually prejudiced him in order

18

to excuse his procedural default. *See Ambrose v. Booker*, 684 F.3d 638, 650-51 (6th Cir. 2012) (Even where there is structural error, "[c]omity requires us to avoid overturning defaulted claims absent a showing of *actual prejudice*. Given . . . the procedural default rule's roots in comity and federalism, a petitioner must show that he was actually prejudiced *regardless of the nature of the underlying constitutional claim*.") (emphasis added).[5] In this context, a petitioner demonstrates prejudice by showing "that the outcome [of the relevant proceeding] would have been different" absent the constitutional error. *Id*. at 651.

In this case, Petitioner cannot demonstrate that the outcome of his trial would have been different absent the trial court's instruction on the Castle Doctrine. The evidence at trial overwhelmingly supported Petitioner's guilt. *See, e .g., Jaradat v. Williams*, 591 F.3d 863, 864 (6th Cir. 2010) ("We hold that the physical evidence supporting the [relevant charge] is sufficiently weighty that the [the alleged error] did not have a substantial and injurious effect on the jury's verdict."). The testimonies of the witnesses to the shooting were generally consistent regarding the relevant events, and

---

[5] The list of errors that constitute structural errors is tightly circumscribed. *See Rose v. Clark*, 478 U.S. 570, 578 (1986) ("While there are some errors to which [harmless error analysis] does not apply, they are the exception and not the rule."). The Supreme Court has determined that errors in jury instructions generally are "not structural but instead trial errors subject to harmless error review." *Hedgpeth v. Pulido*, 555 U.S. 57, 60 (2008) (collecting cases). "[H]armless-error analysis applies to instructional errors so long as the error at issue does not categorically 'vitiat[e] *all* the jury's findings.'" *Id*. at 61 (quoting *Neder v. U.S.*, 527 U.S. 1, 11 (1999)). As discussed herein, given the nature of the instruction at issue and the facts of the underlying criminal case, Petitioner cannot show that the trial court's decision to instruct the jury on the Castle Doctrine – while questionable – entirely vitiated the jury's findings in this case. *See also Ambrose*, 684 F.3d at 651 (collecting cases where the Supreme Court declined to presume prejudice resulting from an erroneous jury instruction).

19

Petitioner's counsel cross-examined them regarding inconsistencies and their conduct after the shooting.  (Tr. 262-306 307-37, 353-71, 372-85, 438-68.)  One witness, Thornton, identified Petitioner as the shooter.  (Tr. 276-77.)  Petitioner's co-defendant testified that Petitioner planned to rob the occupants of the home where the shooting occurred, entered the home prior to the shooting, and exited with multiple gunshot wounds.  (Tr. 558-600.)  Forensic evidence, *i.e.*, blood on the firearm dropped outside the scene of the shooting and in various locations inside the home, connected Petitioner to a weapon that fired projectiles discovered inside the home.  (Tr. 225-27. 249-50, 490-93.)

Petitioner argues that the trial court's instruction impermissibly shifted the burden of proof to Petitioner, such that he was sufficiently prejudiced to merit the excuse of his procedural default.  This argument lacks merit.  The jury instruction at issue was not relevant to the question of Petitioner's guilt with respect to the charges of which he was convicted.  This was not a case in which Petitioner claimed that he fired on Darquez or Aaron Crosby in self defense.  Rather, as evidenced by his statements to Detective Novitski during his interview, Petitioner denied even having a weapon, much less firing one in the basement of Thornton's home.  In other words, his defense did not implicate the issue of why he fired and whether it was justified.  The trial court's instruction directed the jury to consider: (1) whether Aaron Crosby (who was not a defendant at Petitioner's trial) could assert self-defense with respect to Crosby's shooting of Petitioner; and (2) whether Petitioner had proven by a preponderance of the evidence that he was entitled to be in the house at the time of the shooting, such that Crosby could not benefit from the rebuttable presumption created by the Castle Doctrine.  While

the trial court's decision to include this instruction was inexplicable, the issues set forth in the instruction were not determinative of Petitioner's guilt or innocence with respect to the murder of Darquez, the victim listed in each count of the indictment.  The instruction did not relieve the State of its burden of persuasion with respect to any of the counts in the indictment.  Nor did it require Petitioner to demonstrate his innocence with respect to any of the offenses of which he was convicted.  Petitioner does not challenge the validity of the other instructions in the trial court's charge to the jury.  In other words, while likely error, the record does not suggest that the trial court's Castle Instruction impermissibly shifted the burden of proof onto Petitioner with respect to any of the relevant findings of the jury.[6]

Given the evidence at trial and the fact that the relevant jury instruction did not misstate the burden of proof with respect to the offenses in the indictment, Petitioner

_____

[6] The trial court instructed the jury as follows regarding the State's burden of proof in the offenses with which Petitioner was charged:

> As we have learned, every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt.
>
> A defendant must be acquitted unless the state produced evidence which convinces you beyond a reasonable doubt of each essential element of any crime charged in the indictment.
>
> However, if the state did produce evidence which convinces you beyond a reasonable doubt of each essential element of any crime charged in the indictment, then the defendant must be found guilty thereof.

(Tr. at 715-16.)  Thereafter, as the trial court described the elements of each offense charged in the indictment, the court reminded the jury that, in order to convict Petitioner of the offense, the jury was required to find each element "beyond a reasonable doubt." (*See*, e.g., Tr. at 728, 741, 746-47.)

21

cannot demonstrate that, absent the trial court's instruction on the Castle Doctrine, the outcome of his trial would have been different.  Petitioner's argument that the trial court's instruction constituted structural error is not sufficient to merit the excuse of his procedural default in this case.

### b.    Actual Innocence

A petitioner may satisfy the fundamental miscarriage of justice exception to procedural default by submitting evidence that a constitutional violation has resulted in the conviction of someone who is actually innocent.  See *Dretke v. Haley*, 541 U.S. 386, 393 (2004).  A petitioner relying on actual innocence to overcome a procedural default faces a substantial burden, as "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536-37 (2006) (quoting *Schlup*, 513 U.S. at 327).  A petitioner must advance new evidence not presented at trial to support a claim of actual innocence, but a court's determination as to whether a reasonable jury would have found the petitioner guilty should be based both on the new evidence and on the evidence presented at trial.  *House*, 547 U.S. at 537-38.  In addition, the standard permits review only in the extraordinary case:  "'[I]n the vast majority of cases, claims of actual innocence are rarely successful.'" *Id.* at 538 (quoting *Schlup*, 513 U.S. at 324). Finally, if the asserted new evidence so requires, the court may include in its deliberations assessments of the credibility of witnesses in determining whether a reasonable jury would have convicted the petitioner.  *House*, 547 U.S. at 538-39.

22

Here, Petitioner's claim that he is actually innocent is not based on any new evidence. Rather, he argues that the evidence presented at trial was not sufficient to demonstrate his guilt. To support this argument, he sets forth a version of the evidence that questions the credibility of the witnesses and emphasizes the weaknesses in the State's case. This is simply insufficient to demonstrate that Petitioner is actually innocent of the offenses of which he was convicted. Thus, this argument does not meet the high threshold for a claim of actual innocence in this context. Petitioner is not entitled to the excuse of his procedural default on the basis of his actual innocence.

Petitioner is not entitled to the excuse of his procedural default on the basis of either cause and prejudice or a fundamental miscarriage of justice. Accordingly, his single ground for relief should be dismissed with prejudice.

### V. Conclusion

For the reasons given above, the petition should be dismissed with prejudice.

Date: April 7, 2015                                    /s/ Nancy A. Vecchiarelli
                                                       United States Magistrate Judge

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.**

23